## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | **:** | |
| **CLINTON PLUMBING AND HEATING OF** | **:** | |
| **TRENTON, INC., et al.,** | **:** | |
| **Plaintiffs,** | **:** | |
| **v.** | **:** | **CIVIL ACTION** |
| | **:** | |
| **STEPHEN ANTHONY CIACCIO, and** | **:** | **NO. 09-2751** |
| **NICOLE MARIE CIACCIO,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |
| | **:** | |

## MEMORANDUM OPINION

**RUFE, J.**                                                                        **December 6, 2011**

This case arises from Defendant Stephen Anthony Ciaccio's unauthorized transfer of

funds from the bank account of Plaintiff Clinton Plumbing and Heating of Trenton, Inc. ("CPH")

to Mr. Ciaccio's credit account with Capital One Bank ("Capital One").[1]  Pending before the

Court is Plaintiffs' Motion for Summary Judgment on all claims against the remaining

Defendants.[2]  For the reasons that follow, Plaintiffs' Motion will be granted in part and denied in

part.

### I. FACTUAL AND PROCEDURAL BACKGROUND[3]

Plaintiff CPH is a small, family-owned corporation owned and operated by Plaintiffs

---

[1] Capital One was a Defendant in this case.  By stipulation filed September 6, 2011, all claims against
Capital One were dismissed with prejudice.

[2] Doc. No. 46.

[3] Except where otherwise noted, the facts are undisputed.

Peter and Nancy Pelicano.[4]  CPH provides plumbing and heating services to customers in New Jersey and Pennsylvania, maintaining its office in New Jersey.[5]  Mr. and Mrs. Pelicano wished to upgrade the technology of CPH and, to this end, on November 21, 2007, entered into an agreement with Defendant Stephen Ciaccio[6] whereby Mr. Ciaccio agreed to upgrade CPH's computer hardware, network, and software, and to provide continuing maintenance and repair of the upgraded system.[7]

Mr. and Mrs. Pelicano gave Mr. Ciaccio access to CPH's financial account information for the purpose of restructuring CPH's financial software.[8]  Mr. Ciaccio was authorized to make payments to creditors of CPH only when expressly directed to do so by Mr. or Mrs. Pelicano.[9]  Mr. Ciaccio was not authorized to withdraw money from CPH bank accounts to satisfy his own credit obligations to Capital One.[10]

From February 2008 to June 2008, Mr. Ciaccio acted as comptroller for CPH, a role which required him to monitor CPH's bank accounts with Sun National Bank.[11]  CPH had entered into an agreement with Sun National which allowed CPH to make and receive automatic

---

[4]  Am. Compl. ¶¶ 2-5; Defs. Stephen and Nicole Ciaccio's Answer (hereinafter "Answer") ¶¶ 2-5; Pls.' Mot. for Summ. J. ¶ 1; Defs.' Answer to Mot. For Summ. J. ¶ 1.

[5]  Am. Compl. ¶ 2; Answer ¶ 2.

[6]  Mr. Ciaccio conducts business as a sole proprietor under the trade name Krash Enterprise.  Am. Compl. ¶ 11; Answer ¶ 11.

[7]  Am. Compl. ¶ 13; Answer ¶ 13; Pls.' Mot. for Summ. J. ¶ 2; Defs.' Answer to Mot. For Summ. J. ¶ 2.

[8]  Pls.' Mot. for Summ. J. ¶¶ 3-4; Defs.' Answer to Mot. For Summ. J. ¶¶ 3-4; Declaration of Nancy Pelicano (hereinafter "N. Pelicano Decl.") ¶¶ 3,5.

[9]  Pls.' Mot. for Summ. J. ¶ 6; Defs.' Answer to Mot. For Summ. J. ¶ 6; N. Pelicano Decl. ¶ 7.

[10]  Pls.' Mot. for Summ. J. ¶ 5; Defs.' Answer to Mot. For Summ. J. ¶ 5; N. Pelicano Decl. ¶ 6.

[11]  Am. Compl. ¶ 20; Answer ¶ 20; Pls.' Mot. for Summ. J. ¶ 10; Defs.' Answer to Mot. For Summ. J. ¶ 10.

clearing house ("ACH") transfers.[12]  As comptroller, Mr. Ciaccio had access to CPH's three bank

accounts with Sun National, but was not permitted to make payments from these accounts.[13]

However, beginning on or about March 20, 2008, Mr. Ciaccio began transferring money from

CPH's bank accounts to Mr. Ciaccio's own credit account with Capital One through the use of

ACH transfers.[14]

     For reasons unrelated to Mr. Ciaccio's alleged fraudulent transfers, CPH closed the three

Sun National bank accounts and on June 16, 2008, opened new accounts with Roman Bank.[15] As

with the Sun National accounts, CPH had an agreement which authorized ACH transfers from

Roman Bank accounts, but only Mr. and Mrs. Pelicano were authorized to make such transfers.[16]

Mr. Ciaccio continued to use CPH funds from the Sun National and Roman accounts to satisfy

his credit obligation to Capital One.[17]

     In July 2008, Mrs. Pelicano noticed that money was being debited from CPH's bank

account through ACH transfers and asked Mr. Ciaccio for an explanation.[18]  Mr. Ciaccio replyied

---

[12]  Am. Compl. ¶ 22; Pls.' Mot. for Summ. J. ¶ 9; Defs.' Answer to Mot. For Summ. J. ¶ 9.

[13]  Am. Compl. ¶ 23; Pls.' Mot. for Summ. J. ¶¶ 7-8; Defs.' Answer to Mot. For Summ. J. ¶¶ 7-8.

[14]  Am. Compl. ¶¶ 29-31; Pls.' Mot. for Summ. J. ¶¶ 15-16; Defs.' Answer to Mot. For Summ. J. ¶¶ 15-16; Deposition of Stephen Ciaccio ("S. Ciaccio Depo.") at 71:18-72:5; Stipulation, Pls.' Mot. for Summ. J., Ex. C.

[15]  Am. Compl. ¶¶ 24-25; Pls.' Mot. for Summ. J. ¶¶ 11-12; Defs.' Answer to Mot. For Summ. J. ¶¶ 11-12.

[16]  Am. Compl. ¶¶ 26-28; Pls.' Mot. for Summ. J. ¶¶ 13-14; Defs.' Answer to Mot. For Summ. J. ¶¶ 13-14.

[17]  Am. Compl. ¶ 37; Pls.' Mot. for Summ. J. ¶¶ 17-18; Defs.' Answer to Mot. For Summ. J. ¶¶ 17-18; S. Ciaccio Depo. at 71:18-72:5; Stipulation, Pls.' Mot. for Summ. J., Ex. C.

[18]  Pls.' Mot. for Summ. J. ¶ 19; S. Ciaccio Depo. at 70:3-61:10.  In their Answer to the Motion for Summary Judgment, Defendants "deny as stated" the assertion that Mr. Ciaccio was aware that Mrs. Pelicano noticed.  Defendants' Answer provides: "defendant Stephen Ciaccio avers that the plaintiffs at all times employed a certified public accountant and should have been aware of the debits in their accounts. . . . The plaintiffs should have been aware of the discrepancies long before they became aware."  Defs.' Answer to Mot. For Summ. J. ¶¶ 19-20. Regardless of when Plaintiffs "should have become aware" of any discrepancies and regardless of whether Mr.

dishonestly that the money was being transferred to satisfy only CPH's obligation to Capital One.[19]  In November 2008, after Mr. Ciaccio's employment was terminated, Mr. and Mrs. Pelicano confirmed that the payments made were unauthorized, informed Capital One of this discovery, and changed the passwords to CPH's online accounts.[20]

Mr. Ciaccio admits to transferring a total of $118,186.78 from CPH's accounts—$72,049.90 from the Sun National accounts and $46,136.88 from the Roma Bank accounts.[21] Since March 2008, Mr. Ciaccio has transferred a total of $124,515.07 from his own personal and business accounts to accounts he holds jointly with his wife, Defendant Nicole Ciaccio.[22] During the time when Mr. Ciaccio was stealing money from CPH, Mr. Ciaccio made several large purchases, including a home, jewelry, furniture, appliances, and other household items.[23] Although Defendants admit that they made these purchases, they deny that the money used to make such purchases was the money which was stolen from CPH, arguing that by Plaintiffs' own admission, the stolen money was used to pay the balance Mr. Ciaccio owed Capital One.[24]

---

Ciaccio knew that Mrs. Pelicano was aware of the discrepancies when she approached him in July 2008, it is undisputed that Mrs. Pelicano was aware and that, when she approached Mr. Ciaccio about the discrepancies, he failed to inform her that he was using the funds of CPH to pay his personal and business debts.

[19]  Pls.' Mot. for Summ. J. ¶ 19; Defs.' Answer to Mot. For Summ. J. ¶ 19; S. Ciaccio Depo. at 70:3-61:10.

[20]  Pls.' Mot. for Summ. J. ¶ 20; Defs.' Answer to Mot. For Summ. J. ¶ 20; N. Pelicano Decl. ¶ 14.

[21]  Pls.' Mot. for Summ. J. ¶ 21; Defs.' Answer to Mot. For Summ. J. ¶ 21.

[22]  Pls.' Mot. for Summ. J. ¶ 24; Defs.' Answer to Mot. For Summ. J. ¶ 24; Bank of America Statements, Pls.' Mot. for Summ. J., Ex. O; S. Ciaccio Depo. at 14:6-16:20, 18:6-20:5, 20:12-38:8; N. Ciaccio Depo. at 4:12-6:8.

[23]  Pls.' Mot. for Summ. J. ¶¶ 22-25; Defs.' Answer to Mot. For Summ. J. ¶¶ 22-25; Property Record,   Pls.' Mot. for Summ. J., Ex. N; Capital One Credit Card Statement, Pls.' Mot. for Summ. J., Ex. P; S. Ciaccio Depo. at 12:24-13:1, 73:3-81:8; Deposition of Nicole Ciaccio ("N. Ciaccio Depo.") at 9:4-15.

[24]  Defs.' Answer to Mot. For Summ. J. ¶¶ 22-25.

On May 19, 2010, a grand jury of the state of New Jersey returned an indictment charging

Mr. Ciaccio with one count of theft by unlawful taking in the second degree.[25]  On January 6,

2011, Mr. Ciaccio pled guilty to theft by unlawful taking by exercising dominion and control

over the movable property of CPH, that is, its money, in the amount of $118,186.78.[26]  Mr.

Ciaccio was ordered to pay restitution in the amount of $118,000.

On June 19, 2009, Plaintiffs filed the instant civil action against Defendants Stephen

Ciaccio, Nicole Ciaccio, and Capital One.  On October 22, 2011, the Court dismissed Counts II,

VII, and XI.  The remaining claims against Capital One (Counts IV, IX, and X) were dismissed

by stipulation among the parties filed on September 6, 2011.  Plaintiffs now move for summary

judgment on liability as to the remaining claims asserted against Defendants Stephen and Nicole

Ciaccio: computer fraud and abuse (Count I); conversion (Count III); fraud (Count V); identity

theft (Count VI); and fraudulent transfer (Count VIII).

## II. STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."[27]  Summary judgment may be granted only if the moving party

---

[25]  Pls.' Mot. for Summ. J. ¶ 26; Defs.' Answer to Mot. For Summ. J. ¶ 26; Indictment, Pls.' Mot. for Summ. J., Ex. A; S. Ciaccio Depo. at 38:21-39:19.

[26]  Pls.' Mot. for Summ. J. ¶ 27; Defs.' Answer to Mot. For Summ. J. ¶ 27; Ciaccio Guilty Plea Form, Pls.' Mot. for Summ. J., Ex. B; S. Ciaccio Depo. at 39:19-41:5.

[27]  Goodman v. Unity Twp., No. 03-1650, 2006 WL 840339, at *2 (W.D. Pa. Mar. 30, 2006) (quoting Fed. R. Civ. P. 56(c)(2) (2010)).  Amendments effective December 2010 moved this language to Federal Rule of Civil Procedure 56(a) and revised it slightly to read "if the movant shows that there is no genuine dispute as to any material fact . . . ."  These revisions did not, however, change the summary judgment standard.

persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."[28]   A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[29]   A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[30]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[31] Further, a court may not weigh the evidence or make credibility determinations.[32]   Nevertheless, the party opposing summary judgment must support each essential element of his or her opposition with concrete evidence in the record.[33]   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[34]   This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[35]   Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no

---

[28]   <u>Miller v. Ind. Hosp.</u>, 843 F.2d 139, 143 (3d Cir. 1988).

[29]   <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

[30]   <u>Id.</u>

[31]   <u>Hugh v. Butler County Family YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005).

[32]   <u>Boyle v. County of Allegheny</u>, 139 F.3d 386, 393 (3d Cir. 1998).

[33]   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

[34]   <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

[35]   <u>Walden v. Saint Gobain Corp.</u>, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing <u>Goodman v. Mead Johnson & Co.</u>, 534 F.2d 566, 573 (3d Cir. 1976)).

genuine issue of material fact, summary judgment is appropriate.[36]

### III. Discussion

**A.    Preliminary Matters**

**1.    *Choice of Law***

In their Motion for Summary Judgment, Plaintiffs cite Pennsylvania law to support their state law claims.  Plaintiffs explain that although the conduct at issue occurred in both New Jersey and Pennsylvania, there is no conflict between Pennsylvania and New Jersey law as it applies to the claims at issue in this case and thus, the Court may apply the law of Pennsylvania as the forum state.  Defendants counter that, "[s]ince the plaintiffs and the defendants live in New Jersey and the theft took place in New Jersey, it is clear that the law of New Jersey should apply."[37]

In exercising supplemental jurisdiction over a state law claim, a federal district court sitting in diversity applies the choice of law principles of the forum state.[38]  Accordingly, this Court applies Pennsylvania choice of law rules in exercising supplemental jurisdiction over Plaintiffs' state law claims.  "The first step in the [choice of law] analysis under Pennsylvania law is to determine whether a conflict actually exists; if no conflict exists between the laws of the relevant states, then further analysis is unnecessary and a court can refer to the states' laws

---

[36]   Celotex, 477 U.S. at 322; Wisniewski v. Johns–Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

[37]   Defs.' Answer to Mot. For Summ. J. at 6.

[38]   Gluck v. Unisys Corp., 960 F.2d 1168, 1179 (3d Cir. 1992) (citing Klaxon co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).

interchangeably."[39]  Where a court identifies that a conflict does exist, it must determine which

state's law to apply.  "Pennsylvania applies a flexible rule which permits analysis of the policies

and interests underlying the particular issue before the court and directs courts to apply the law of

the state with the 'most interest in the problem.'"[40]  This methodology was adopted in Griffith v.

United Air Lines Inc.,[41] and is a combination of the "contacts analysis" and the "interests

analysis" used by other states.[42]

      Here, the Court's analysis ends with the first step of the conflicts inquiry.  There is no

actual conflict between the law of Pennsylvania and New Jersey with respect to the state law

claims at issue here: conversion,[43] fraud,[44] identity theft,[45] and fraudulent transfer.[46]

---

[39]  Vurimindi v. Fuqua Sch. of Bus., No. 10-4036, 2011 WL 2601584, at *2 (3d Cir. July 1, 2011) (citing Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229-30 (3d Cir. 2007)).

[40]  Specialty Surfaces Int'l v. Cont'l Cas. Co., 609 F.3d 223, 229 (3d Cir. 2010).

[41]  203 A.2d 796 (Pa. 1964).

[42]  Vurimindi, 2011 WL 2601584, at *5.

[43]  Marshall v. Fenstermacher, 388 F. Supp. 2d 536, 555-56 (E.D. Pa. 2005) ("There is no conflict between Pennsylvania and New Jersey law with respect to the tort of conversion; the cause of action includes the same elements in both states.").

[44]  Chase Manhattan Mortg. Corp. v. Advanta Corp., No. 01-0507, 2005 WL 2234608, at *13 n.30 (D. Del. Sept. 8, 2005) ("[T]here is no conflict between proving fraud under New Jersey law or Pennsylvania law because both states' laws require proof of essentially the same substantive elements.  Compare Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999) (noting the elements as '(1) [a] representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.') (internal citations omitted) with Gennari v. Weichert Co. Realtors, 691 A.2d 350, 367-68 (N.J. 1997) (noting the five elements of common-law fraud as '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.').")

[45]  Both Pennsylvania and New Jersey have identity theft statutes.  See 18 Pa. Cons. Stat. Ann. § 4120; N.J. Stat. Ann. § 2C:21-17.  Under Pennsylvania law, "[a] person commits the offense of identity theft of another person if he possesses or uses, through any means, identifying information of another person without the consent of that other person to further any unlawful purpose."  18 Pa. Cons. Stat. Ann. § 4120(a).  "In a civil action based on identity theft as defined in 18 Pa. Cons. Stat. Ann. § 4120 (relating to identity theft), a court of competent

Consequently, "further analysis is unnecessary and [the C]ourt can refer to the states' laws interchangeably."[47]

### 2.    *Res Judicata*

Defendants Stephen and Nicole Ciaccio oppose the Motion for Summary Judgment arguing that *res judicata* applies to bar Plaintiffs from pursuing their claims in light of the New Jersey indictment, guilty plea, and judgment.   According to Defendants, the New Jersey Superior Court, "a court of competent jurisdiction, has fixed the amount of damages in this controversy at $118,000 and has ordered this defendant [Mr. Ciaccio] to pay the same."[48]   Mr. Ciaccio was a defendant in both actions and the judgment was final.   Therefore, Defendants assert that *res*

---

jurisdiction may award damages as follows: (1) Actual damages arising from the incident or $500, whichever is greater.  Damages include loss of money, reputation or property, whether real or personal.  The court may, in its discretion, award up to three times the actual damages sustained, but not less than $500."  42 Pa. Cons. Stat. Ann. § 8315.

Similarly, under New Jersey law, "[a] person is guilty of an offense if the person . . . . [p]retends to be a representative of some person or organization and does an act in such pretended capacity for the purpose of obtaining a benefit for himself or another or to injure or defraud another."  N.J. Stat. Ann. § 2C:21-17.  "Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use of that person's personal identifying information, in violation of . . . [N.J. Stat. Ann. §] 2C:21-17 . . . may bring an action in any court of competent jurisdiction.  In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award damages in an amount three times the value of all costs incurred by the victim as a result of the person's criminal activity."  N.J. Stat. Ann. § 2C:21-17.4.

Since both statutes required proof of the same substantive elements and since both permit an award of damages up to three times the actual damages sustained, the Court finds that the laws do not conflict.

[46]  Compare 12 Pa. Cons. Stat. Ann. § 5104 (a)(1) ("A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor of the debtor."); with N.J. Stat. § 25:2-25 ("A transfer made . . . [b]y a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor.").

[47]  Vurimindi v. Fuqua Sch. of Bus., No. 10-4036, 2011 WL 2601584, at *2 (3d Cir. July 1, 2011) (citing Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229-30 (3d Cir. 2007)).

[48]  Defs.' Answer to Mot. For Summ. J. at 7.

*judicata* bars the assertion of claims arising out of Mr. Ciaccio's alleged conversion.  Plaintiffs

assert that *res judicata* does not bar the assertion of a civil claim against a defendant who has

pled guilty to criminal charges even where the civil claim and criminal charge arise out of the

same unlawful activity.  The Court agrees.

Contrary to Defendants' assertion, *res judicata* does not apply where the first action is

criminal and the second action is civil.[49]  "[T]he doctrine of claim preclusion, or *res judicata*, . . .

bars repetitious suits involving the same cause of action once a court of competent jurisdiction

has entered a final judgment on the merits."[50]  For *res judicata* to apply there must have been "(1)

a final judgment on the merits in a prior suit involving (2) the same parties or their privies and

(3) a subsequent suit based on the same cause of action."[51]

Here, Plaintiffs were not parties to the criminal case, and *res judicata* cannot bar their

assertion of claims against Mr. Ciaccio.[52]  Further, although Mr. Ciaccio's criminal conviction

for theft by unlawful taking may evidence his liability in this action, the criminal action did not

---

[49]  Jackson v. City of Paterson, No. 04-3717, 2006 WL 2465314, at *2 n.1 (D.N.J. Aug. 22, 2006) (quoting Sibert v. Phelan, 901 F. Supp. 183, 186 (D.N.J. 1995)) ("Res judicata simply does not apply when the first action is criminal and the second action is civil.") (internal quotation omitted); Brown v. City of Trenton, No. 04-5576,  2006 WL 1722586, at *5 (D.N.J. June 19, 2006) ("Res judicata cannot apply when, as here, the first action is criminal and the second action is civil."); see also United States v. One Assortment of 89 Firearms, 465 U.S. 354, 358-59 (1984) (quoting Helvering v. Mitchell, 303 U.S. 391, 397 (1938)) ("The difference in degree in the burden of proof in criminal and civil cases precludes application of the doctrine of *res judicata*."); PSA, LLC v. Gonzales, 271 F. App'x 218, 221 (3d Cir. 2008) ("[A] judgment in a civil action is not ordinarily res judicata as to a subsequent criminal action.").

[50]  United States v. Tohono O'Odham Nation, 131 S. Ct. 1723, 1730 (2011) (internal quotation and citation omitted).

[51]  Wallace v. United Parcel Serv., 387 F. App'x 127, 129 (3d Cir. 2010) (quoting In re Mullarkey, 536 F.3d 215, 225 (3d Cir. 2008)).

[52]  Herrera v. City of New Brunswick, No. 04-3002, 2008 WL 305275, at *16 (D.N.J. Feb. 1, 2008) (holding that a criminal acquittal did not bar a subsequent civil suit particularly in light of the fact that plaintiff was not a party to the criminal action).

encompass all claims at issue here.  Notably, Plaintiffs seek punitive damages above the amount

which would compensate them for their loss (i.e., above the $118,000 restitution amount).

Because Plaintiffs could not bring any claims for damages in the criminal case, the Court finds

that *res judicata* does not bar the claims here.

### B.  Count I - Computer Fraud

Count I pleads a claim of computer fraud in violation of the federal Computer Fraud and

Abuse Act ("CFAA" or "the Act"). The CFAA makes it unlawful to "knowingly and with intent

to defraud, access[] a protected computer without authorization, or exceed[] authorized access,

and by means of such conduct further[] the intended fraud and obtain[] anything of value, unless

the object of the fraud and the thing obtained consists only of the use of the computer and the

value of such use is not more than $5,000 in any 1-year period."[53]   While primarily a criminal

statute, the CFAA provides for a private cause of action based on a violation of the Act,  " if the

conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection

(c)(4)(A)(i)."[54]  These five factors are:

> (I) loss to 1 or more persons during any 1-year period (and, for purposes of
> an investigation, prosecution, or other proceeding brought by the United
> States only, loss resulting from a related course of conduct affecting 1 or
> more other protected computers) aggregating at least $5,000 in value;
> (II) the modification or impairment, or potential modification or impairment,
> of the medical examination, diagnosis, treatment, or care of 1 or more
> individuals;
> (III) physical injury to any person;

---

[53]  18 U.S.C.A. § 1030(a)(4).

[54]  18 U.S.C.A. § 1030(g).  The CFAA was amended in September 2008; as relevant here, it re-numbered certain clauses but did not effect substantive changes.  Plaintiffs cite the *amended* statute; for the sake of clarity, the Court will do so as well.

> (IV) a threat to public health or safety; [and]
> (V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security.[55]

Plaintiffs argue that they may sue under the Act because they incurred a loss of $118,186.78 (the amount of money Mr. Ciaccio withdrew from the accounts of CPH to satisfy his own debt obligations). The Court disagrees.

"Loss" is specifically defined under the CFAA as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."[56] As the Court explained in an earlier opinion in this case:

> Various courts have interpreted "loss" to mean the remedial costs of investigating a computer for damage, remedying damage done, and costs incurred while the computer is inoperable.[57] In Crown Coal & Coke Co. v. Compass Point Resources, LLC, the court explained that: "According to the CFAA, lost 'revenue' constitutes 'loss' if it is incurred 'because of interruption of service.' Therefore, if defendants had lost revenue because their computers were inoperable, that would be the type of lost revenue contemplated by the statute."[58] This interpretation of "loss" has been adopted by other courts. For instance, in B & B Microscopes v. Armogida, Plaintiffs suffered a loss after they lost access to data and were unable to reproduce

---

[55] 18 U.S.C.A. § 1030(c)(4)(A)(i)(I)-(V).

[56] 18 U.S.C. § 1030(e)(11).

[57] E.g., Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004), *aff'd*, 166 F. App'x 559 (2d Cir. 2006); Dudick, ex rel. Susquehanna Precision, Inc. v. Vaccarro, No. 06-2175, 2007 WL 1847435, at *6 (M.D. Pa. June 25, 2007); P.C. Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, LLC, No. 04-4554, 2007 WL 708978, at *5 (D.N.J. Mar. 5, 2007).

[58] No. 07-1208, 2009 WL 1806659, at *8 (W.D. Pa. June 23, 2009).

their operational system.[59]   Conversely, in <u>Advantage Ambulance Group, Inc.
v. Lugo,</u> Plaintiffs' claim for future lost revenue because of the dissemination
of its trade secrets was not "loss" under the CFAA.[60][61]

A compensable "loss" under the CFAA, therefore, is a loss which is in some way related to

functionality of the protected computer at issue.  Either the loss is the cost of remedial measures

taken to investigate or repair the damage to the computer, or the loss is the amount of lost

revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable

because of a defendant's misfeasance.

Here, the facts do not show that the computers at issue were in any way damaged or

rendered inoperable.  Plaintiffs' only loss was the result of Mr. Ciaccio stealing money via ACH

transfers.  This loss is not the type of "loss" contemplated by the CFAA and is, therefore, not a

loss for which the CFAA provides a civil remedy.  Although the conduct of Mr. Ciaccio was

clearly unlawful, the CFAA does not provide a civil remedy for this wrong.  Accordingly, the

Court will dismiss Count I from the Amended Complaint.

---

[59]   532 F. Supp. 2d 744 (W.D. Pa. 2007).

[60]   No. 08-3300, 2009 WL 839085, at *4 (E.D. Pa. Mar. 20, 2009).

[61]   <u>Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio,</u> No. 09-2751, 2010 WL 4224473, at *6 (E.D.
Pa. Oct. 22, 2010) (footnotes re-numbered from original), (Doc. No. 31).

## C.   **Count III - Conversion**

"[C]onversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification."[62]  "Money may be the subject of conversion."[63]  Mr. Ciaccio pled guilty to theft by unlawful taking under New Jersey law.  Under New Jersey law, theft by unlawful taking occurs when a person "exercises unlawful control over movable property of another with purpose to deprive him thereof."[64]  In admitting that he exercised unlawful control over Plaintiffs' money with the intent to deprive them of such money, Mr. Ciaccio has effectively conceded liability for the tort of conversion.  Defendants have not mustered any argument in opposition to this conclusion.  Accordingly, the Court will grant summary judgment in favor of Plaintiffs on Count III.

## D.   **Count V - Fraud**

To establish common law fraud, Plaintiff must prove (1) a misrepresentation of material fact, (2) made with knowledge of its falsity or with reckless disregard to whether it was true or false, and (3) made with intent to mislead another into relying on it, (4) another's justifiable

---

[62] In re Olick, No. 10-7492, 2011 WL 5075104, at *6 (E.D. Pa. Oct. 26, 2011) (quoting Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 726 (Pa.1964)); see also Schenkel v. Flaster, 54 F. App'x 362, 365 (3d Cir. 2002) (quoting Mueller v. Technical Devices Corp., 84 A.2d 620, 623 (N.J. 1951)) ("Conversion is 'the exercise of any act of dominion in denial of another's title to the chattels, or inconsistent with such title.'").

[63] Pittsburgh Constr. Co. v. Griffith, 834 A.2d 572, 581 (Pa. Super. Ct. 2003); McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000); see also Cargill Global Trading v. Applied Dev. Co., 706 F. Supp. 2d 563, 578 (D.N.J. 2010) (citing Hirsch v. Phily, 73 A.2d 173 (1951)) ("While originally intended to protect title to chattels, conversion today may be applied to money, bonds, promissory notes, and other types of securities . . . .").

[64] N.J. Stat. § 2C:20-3.

14

reliance on the misrepresentation, and (5) damages cause by such reliance.[65]  Here, the

undisputed facts establish that: (1) Mr. Ciaccio misrepresented to Mrs. Pelicano that the ACH

withdrawals from CPH's accounts were used to pay debts CPH owed to Capital One;[66] (2) Mr.

Ciaccio knew that the withdrawals were also used to satisfy his own personal obligations to

Capital One;[67] (3) Mr. Ciaccio intended to mislead Mr. and Mrs. Pelicano into believing that the

payments were made to satisfy CPH's obligations only; (4) Mr. and Mrs. Pelicano relied on these

statements, continuing to employ Mr. Ciaccio through November 2008 even though they had

discovered the unauthorized debits four months earlier; and (5) Plaintiffs incurred a loss of

$118,186.78, representing the amount withdrawn from CPH's account to pay Mr. Ciaccio's

credit card debt.  Plaintiffs have therefore established that Mr. Ciaccio is liable for fraud.   Once

again, Defendants fail to advance any argument to the contrary.  Consequently, the Court will

grant summary judgment in favor of Plaintiffs on Count V.

## E.    Count VI - Identity Theft

A person is liable for identity theft where he "pretends to be a representative of some

person or organization and does an act in such pretended capacity for the purpose of obtaining a

benefit for himself or another or to injure or defraud another."[68]  This is precisely what Plaintiffs

have established Mr. Ciaccio did here.  Plaintiffs placed Mr. Ciaccio in a position of trust, by

---

[65] See Hunt v. U.S. Tobacco Co., 538 F.3d 217, 225 n.3 (3d Cir. 2008) (applying Pennsylvania law); Schenkel, 54 F. App'x at 364 (applying New Jersey law).

[66] See, e.g, S. Ciaccio Depo. at 60:3-61:10.

[67] S. Ciaccio Depo. at 42:13-46:10.

[68] N.J. Stat. Ann. § 2C:21-17; accord 18 Pa. Cons. Stat. Ann. § 4120(a).  See also N.J. Stat. Ann. § 2C:21-17.4 (establishing a private right of action for a violation of the identity theft statute); 42 Pa. Cons. Stat. Ann. § 8315 (same).

hiring him to work as comptroller of CPH.   In this role he had access to the identifying

information of CPH and had access to CPH accounts.[69]   Mr. Ciaccio purported to have the

authority to access CPH's financial information to pay Mr. Ciaccio's personal obligations, when

in truth, he lacked this authority.   He did this for his own benefit.   Again, Defendants have not

presented the Court with an argument to the contrary.   Therefore, Plaintiffs are entitled to

summary judgment in their favor on Count VI.

**F.      Count VIII - Fraudulent Transfer**

        Under Pennsylvania and New Jersey law, a husband and wife who jointly hold title to

property are presumed to do so as tenants by the entirety.[70]   As tenants by the entirety, each

spouse is entitled to equal use, enjoyment, and possession of the entireties property.[71]   Entireties

properties cannot be used to satisfy the claims of creditors of only one spouse.[72]   Under the

Uniform Fraudulent Transfers Act ("UFTA"), property owned solely by a debtor-spouse is an

"asset" subject to attachment, while property owned jointly by both the debtor-spouse and the

non-debtor spouse is not.[73]   "Consequently, the conversion of property owned solely by a

debtor[-spouse] which would constitute an asset under the UFTA into entireties property which

would not, constitutes a [potentially fraudulent] transfer under the UFTA."[74]   Thus, to the extent

---

[69]   Am. Compl. ¶ 20; Answer ¶ 20; Pls.' Mot. for Summ. J. ¶ 10; Defs.' Answer to Mot. For Summ. J. ¶ 10.

[70]   Constitution Bank v. Olson, 620 A.2d 1146, 1149-50 (Pa. Super. Ct. 1993); N.J. Stat. Ann. § 46:3-17.2.

[71]   Popky v. United States, 419 F.3d 242, 245 (3d Cir. 2005).

[72]   In re Brannon, 476 F.3d 170, 173 (3d Cir. 2007); United States v. Green, 201 F.3d 251, 253 (3d Cir. 2000).

[73]   12 Pa. Cons. Stat. Ann. §§ 5101(b)(3), 5107; N.J. Stat. §§ 25:2-21, 25:2-29.

[74]   In re Dawley, No. 01-32215, 2005 WL 2077074, at *4 (Bkrtcy. E.D. Pa. Aug. 10, 2005).

Mr. Ciaccio has insulated his vulnerable property by transferring it to himself and Mrs. Ciaccio

as tenants by the entirety, such transfers are subject to avoidance if the elements of the UFTA are

satisfied.[75]

Under the UFTA, "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether

the creditor's claim arose before or after the transfer was made or the obligation was incurred, if

the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor of the

debtor."[76]  To determine whether the transfer was made with actual intent to defraud, a court

considers the non-exclusive list of factors contained in the UFTA, which are commonly referred

to as "badges of fraud."  Of the eleven factors listed, the following are relevant here:

> (1) the transfer was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
>  . . .
> (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred;
> (9) the transfer occurred shortly after a substantial debt was incurred.[77]

Here, Mr. Ciaccio transferred money from his own account to an account he held jointly

with his wife, an insider.[78]  In doing so, he converted property from an asset subject to attachment

into an asset which is generally insulated from the reach of his creditors.  After the transfer, Mr.

Ciaccio retained control of the property.  He received no value in exchange for the transfer, and

---

[75]  Id.

[76]  12 Pa. Cons. Stat. Ann. § 5104 (a)(1); see also N.J. Stat. § 25:2-25.

[77]  12 Pa. Cons. Stat. Ann. § 5104(b); see also N.J. Stat. § 25:2-26.

[78]  N.J. Stat. § 25:2-22.

made the transfers during the same time period he was stealing money from Plaintiffs.  Further,

in pleading guilty to theft by unlawful taking, Mr. Ciaccio has admitted that he intended to

defraud Plaintiffs, his creditors,[79] by depriving them of their property and then transferring this

property so that it could not be subject to attachment.  Plaintiffs have established that Mr. Ciaccio

fraudulently transferred money from his individual accounts to those he held jointly with his

wife.  Therefore, the transfer is voidable.[80]

 The UFTA allows a creditor to recover against a transferee based on the bad faith of the

transferor.  While it is presumed that a creditor can recover against the debtor-transferor in a suit

for damages based on the transferor's bad faith, a creditor generally does not have the same

remedy as to the transferee.  However, the UFTA provides this protection to creditors and allows

them to reach fraudulently transferred money that is in the hands of a transferee.[81]  Accordingly,

Plaintiffs here may assert a claim against Mrs. Ciaccio as the transferee, based on the bad faith

transfer of assets by her husband.

 However, a transferee's good faith may, in some instances, provide a defense to liability.

A transfer is not voidable as to a transferee if the transferee shows that she "took [the assets] in

good faith for a reasonably equivalent value."[82]   Good faith is an affirmative defense as to which

---

[79] A "creditor" is defined as a "person who has a claim;" a "claim," is a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  12 Pa. Cons. Stat. Ann. § 5101; N.J. Stat. § 25:2-21.

[80] See 12 Pa. Cons. Stat. Ann. §§ 5104, 5107; N.J. Stat. §§ 25:2-26, 25:2-29.

[81]  12 Pa. Cons. Stat. Ann. § 5108(b) ("[T]o the extent a transfer is voidable in an action by a creditor . . . the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against: (1) the first transferee of the asset or the person for whose benefit the transfer was made."); N.J. Stat. § 25:2-30(b) (same).

[82]  12 Pa. Cons. Stat. Ann. § 5108(a); N.J. Stat. § 25:2-30(a).

a defendant bears the burden of proof.[83]  Mrs. Ciaccio has not, and cannot, meet this burden here. There is no evidence that anything of value was exchanged for the assets transferred here. Therefore, Mrs. Ciaccio's good faith does not provide a basis for avoiding liability here.[84]

Accordingly, the Court finds that Plaintiffs are entitled to summary judgment in their favor on Count VIII.[85]

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion will be granted in part and denied in part. The Court will grant the Motion with respect to Counts III, V, VI, and VIII, and enter summary judgment in favor of Plaintiffs on such counts.  The Court will deny the Motion with respect to Count I, dismissing Count I from the Amended Complaint.  The only remaining issue is the damages to which Plaintiffs are entitled.

An appropriate Order follows.

---

[83]  Meiselman v. Hamilton Farm Golf Club LLC, No. 11-0635, 2011 WL 3859846, at *10 (D.N.J. Sept. 1, 2011); United States v. Rocky Mountain Holdings, Inc., No. 08-3381, 2009 WL 564437, at *8 (E.D. Pa. Mar. 4, 2009).

[84]  Additionally, Mrs. Ciaccio has waived this affirmative defense by failing to raise it in her responsive pleading.  Schwartzman v. Hutchison, No. 11-1349, 2011 WL 4471059, at *3 (E.D. Pa. Sept. 27, 2011) (citing Federal Rules of Civil Procedure 8(c) and 12(b)).

[85]  Defendants also argue that Mrs. Ciaccio's affidavit raises a genuine issue of material fact as to whether the Ciaccios used the stolen money to purchase their home.  However, whether Defendants used the actual dollars stolen to purchase their home is of no consequence and therefore, this factual dispute is not material.  The UFTA does not require that the Court trace money in this way.  What is material is whether Mr. Ciaccio transferred any money with the intent to avoid an obligation he owed to Plaintiffs.  The Court finds that he did.